```
 1        IN THE UNITED STATES DISTRICT COURT, MIDDLE DISTRICT

 2              OF FLORIDA, JACKSONVILLE DIVISION

 3

 4   UNITED STATES OF AMERICA,      Jacksonville, Florida

 5                  Plaintiff,      Case No. 3:08-cr-324(S1)-J-25TEM

 6          -vs-                    Thursday, May 7, 2009

 7   HENRY J. GROS,                 10:30 a.m.

 8              Defendant.          Courtroom 10 A

 9

10

11

12              TRANSCRIPT OF SENTENCING HEARING

13        BEFORE THE HONORABLE HENRY LEE ADAMS, JR.

14              UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20   Court Reporter:

21              Deanne M. Moore, RMR, CRR
                221 N. Hogan Street, #184
22              Jacksonville, Florida  32202
                Telephone:  (904) 301-6843  Fax:  (904) 301-6847
23              Internet:  moorertservices@yahoo.com

24
     (Proceedings reported by microprocessor stenography;
25   transcript produced by computer.)
```

```
 1   GOVERNMENT COUNSEL:

 2            JONATHAN McKAY

 3            RONALD HENRY

 4            Assistant United States Attorneys

 5            300 N. Hogan Street, Suite 700

 6            Jacksonville, Florida  32202

 7

 8

 9   DEFENSE COUNSEL:

10            SYLVIA A. IRVIN

11            Assistant Federal Defender

12            200 W. Forsyth Street, Suite 1240

13            Jacksonville, Florida  32202

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **T A B L E   O F   C O N T E N T S**

2    **WITNESS**                                            **PAGE NO.**

3    **CHRISTOPHER EDWARD FERREIRA**

4            DIRECT EXAMINATION BY MR. McKAY             19

5            CROSS EXAMINATION BY MS. IRVIN              26

6

7

8

9

10                   **E X H I B I T S   R E C E I V E D**

11                                                       **PAGE NO.**

12

13                        (NO EXHIBITS)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 P R O C E E D I N G S
 2   Thursday, May 7, 2009                        10:30 a.m.
 3                   - - - - -
 4              THE COURT:  Call the next case.
 5              THE CLERK:  Case number 3:08-cr-324(S1)-J-25TEM,
 6   United States of America versus Henry J. Gros.
 7              Counsel, please state your appearance for the
 8   record.
 9              MR. McKAY:  Jonathan McKay and Ron Henry for the
10   United States.
11              MR. HENRY:  Good morning, Your Honor.
12              THE COURT:  Good morning.
13              MS. IRVIN:  Good morning, Your Honor, Sylvia Irvin
14   on behalf of Mr. Henry Gros.  And before we start, Your
15   Honor, would it be possible for us to get the hearing devices
16   for my client he has -- are you okay?  Are you sure?
17              Your Honor, just in the event that he's not able to
18   hear the proceedings, if we could pause the proceedings.  He
19   says right now he can hear what's going on.
20              THE COURT:  All right.  Let the record show that
21   the defendant -- is it Gros?
22              MS. IRVIN:  It's pronounced Gros, Your Honor.
23              THE COURT:  Mr. Gros is present in court with his
24   lawyer.
25              Sir, you are Henry Gros; is that correct.
```

1             THE DEFENDANT:  Yes, sir.

2             THE COURT:  Let the record also show that Mr. Gros

3     entered a plea of guilty to Count Two of the superseding

4     indictment charging him with interference with military air

5     navigation in violation of Title 18, Sections 32(a)(5) and

6     32(a)(8).  His -- the plea was entered on December 4th.  The

7     plea was accepted.  He's adjudged guilty of the offense.

8             A presentence report was ordered, I've received the

9     report, I've had a chance to review the report.

10             Counselor, did you get a copy of the report?

11             MS. IRVIN:  Yes, Your Honor.

12             THE COURT:  And did you have an opportunity to meet

13     with Mr. Gros and discuss this report?

14             MS. IRVIN:  Yes, Your Honor.

15             THE COURT:  Mr. Gros, did you get a copy of the

16     report?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Did you have a chance to read it?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  And did you meet with your lawyer and

21     discuss it?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Has she answered all of your questions

24     to your satisfaction?

25             THE DEFENDANT:  Yes, sir.

1          THE COURT:  Did the government get a copy of the

2    report?

3          MR. McKAY:  Yes, Your Honor.

4          THE COURT:  Do either of you have any objections to

5    the factual statements contained in this report?

6          MS. IRVIN:  No, Your Honor.

7          MR. McKAY:  No objections, Your Honor.

8          THE COURT:  All right.  There being no objections

9    the Court will adopt those -- the report -- factual

10   statements contained in the report as its own.

11          Probation calculates in this case a base offense

12   level of 18 under 2A5.2(a)(2)(A).  There are no enhancements.

13   The defendant is given a three-level downward adjustment

14   which makes a total offense of 15.  I believe the defendant

15   has zero criminal history points and -- that's correct, he

16   has zero criminal history points, so he's at a Criminal

17   History Category I.

18          At a total offense level 15, Criminal History

19   Category I the range of imprisonment is 18 to 24 months, two

20   to three years supervised release, a fine range of 4,000 to

21   $40,000 fine, and a special assessment of $100 which would be

22   due immediately.

23          Is there an objection to the -- to the guideline

24   calculations?

25          MS. IRVIN:  No, Your Honor.

```
 1              MR. McKAY:  None from the government, Your Honor.
 2              THE COURT:  All right.  There being no objections
 3    to the calculations the Court will adopt the guideline
 4    determination by probation as its own.
 5              Any legal reason why sentence should not be
 6    imposed?
 7              MS. IRVIN:  No, Your Honor.
 8              THE COURT:  Is there anything you want to present
 9    in mitigation or aggravation -- in mitigation rather,
10    counselor?
11              MS. IRVIN:  Yes, Your Honor, I do have mitigation
12    that I would like to present.
13              THE COURT:  Why don't you proceed with that.
14              MS. IRVIN:  Thank you, Your Honor.  Before I begin
15    I'd just like to note for the record the supporters of Mr.
16    Gros that are in the courtroom today, they include his
17    minister Minister Robbins, his employer Mr. Jack Burrow, his
18    good friend and roommate Vicki Jones and her son James Jones.
19    Each of these individuals has provided letters on behalf of
20    Mr. Gros and those were filed with the Court on Monday of
21    this week, Your Honor.
22              THE COURT:  All right.  I will acknowledge a letter
23    from Mr. Burrow of Universal Petroleum, a letter from Mrs. --
24    Reverend Robbins of Midnight Cry Ministry Church, from Vicki
25    Jones and James Jones.
```

1            MS. IRVIN:  Thank you, Your Honor.  In looking at

2    this case, Your Honor, the Court should consider 18 U.S.C.,

3    Section 3582 which states as follows:

4            Factors to be considered in imposing a term of

5    imprisonment.  The Court in determining whether to impose a

6    term of imprisonment, and if a term of imprisonment is to be

7    imposed, in determining the length of the term shall consider

8    the factors set forth in Section 3553(a), what's also known

9    as the Booker factors.

10            I read this to you, Your Honor, because I find that

11    this case in particular is not a case in which a sentence of

12    imprisonment is required or necessary.

13            To begin with, the nature and the circumstances of

14    the offense.  In order to understand what motivated Mr. Gros

15    on the night of May 4, 2008, we have to go back a couple of

16    years.  He moved into his house on the westside, it's a

17    modest trailer home in the area known as Whitehouse.  When he

18    first moved there in January of 2005 he was aware that he was

19    near both Cecil Field and another landing field; however, he

20    also noticed that there were very few flights overhead from

21    the Navy or other commercial flights.  They were infrequent,

22    they were high and they were not over his house or his

23    neighborhood.

24            About six months to a year into living in this

25    residence he noticed an increase in the frequency of these

1    flights.  He also noticed that they were flying lower, which,

2    of course, then made them louder, and as a result he did what

3    any citizen would do, he filed complaints.  He called the

4    Jax -- NAS-Jax hotline, he also called the City of

5    Jacksonville hotline.  He would leave a message on a voice

6    machine or leave a message with the person who answered the

7    phone and he generally did not get a response.

8            But later in March of 2006 he wrote a letter to

9    Senator Nelson.  And that letter was also filed with Your

10   Honor yesterday.  That letter Senator Nelson forwarded to the

11   United States Navy, their office at the Pentagon, asking for

12   their help in investigating his complaints.

13           The government filed a copy of the letter which was

14   sent from the Navy to Senator Nelson yesterday.  I apologize

15   for not filing that letter along with my group of letters,

16   Your Honor, but it's important to understanding where Mr.

17   Gros was coming from.

18           After going to a person, a United States Senator,

19   that he thought would be able to help him, at least begin

20   some kind of investigation, he received this letter that

21   Senator Nelson also received.  It's dated June 15th, 2006.

22   And basically what the letter says is this is where his

23   mobile home is located, he signed this particular consent

24   understanding that he was going to be living in this zone in

25   the city of Jacksonville where he would probably experience

1   60 to 65 decibel level noise, and because of that basically

2   his recourse was to continue to call the Jax NAS noise

3   hotline or the City of Jacksonville hotline.

4         At that point I think that he was a little

5   frustrated.  He was hoping that the senator would ask the

6   Navy to look into this, maybe do some investigation into this

7   and they did not.  So he thought, well, maybe the reason

8   they're not investigating this is because they don't have

9   enough evidence so I'll try to find them better evidence to

10  convince them that this is something that they have to look

11  into.

12        He started keeping track actually in 2006 on daily

13  calendars that he had in his house of when the planes would

14  fly overhead, in particular if it was noisy, the direction in

15  which they were flying, and sometimes he would also note how

16  late, sometimes as late as ten, eleven and after midnight.

17        After making those notations he also thought, well,

18  maybe I need to show them what this looks like, so he started

19  videotaping the planes flying overhead.  And most of the

20  videotapes that he had gave a reference point of the pine

21  trees behind his house to show how low these planes were

22  flying.  With these videos he hoped he would be able to take

23  them to some authority and they might take him more

24  seriously.

25        He also noticed in his opinion the night flights

1    were lower than the day flights, so on May 4, 2008 -- and

2    only on May 4, 2008 -- he went outside and he attempted to

3    take pictures of the tail number of the plane, or at least be

4    able to read the tail numbers of the planes so that he could

5    then call the noise hotline and say this particular plane

6    with this particular tail number was flying over my house at

7    this time, I think they were too low.  This is the evidence

8    that you need I think to extend this -- or start this

9    investigation.

10           When he did this he used the spotlight, and in

11    using the spotlight he intended only to shine the light at

12    the tail of the aircraft.  He only intended to gather

13    evidence as a part of his investigation.  Self help is

14    usually not a good idea.  This wasn't a good idea, but it was

15    never his intent to interfere with or obstruct with the

16    pilots in this case.

17           When the JSO officer showed up that evening,

18    specifically in his report he asked Mr. Gros, who was

19    standing in his backyard when he showed up, what are you

20    doing?  And Mr. Gros said I was gathering evidence of planes

21    flying too low so I was taking pictures.  He didn't lie, he

22    didn't run away, he didn't try to evade anything.  When asked

23    by the officer what he was doing, he was honest because

24    that's what he was doing.  The officer also asked for the

25    spotlight, he readily gave him the spotlight.

1    While he was sitting in the back of the police car

2    after he was mirandized the officer asked him, you know,

3    why -- what was his point of going through all this, and he

4    told -- Mr. Gros told the officer no one wants to help me.

5    He told him of his complaints to Senator Nelson, to the Navy,

6    to the City of Jacksonville, and that he just wanted to get

7    photographic evidence of the planes to prove how low they

8    were flying that night.  He wasn't arrested that night.  The

9    JSO officer wasn't able to find a municipal ordinance or

10   State of Florida statute in which to charge him, so he let

11   him go with the instructions not to spotlight planes any

12   more, and since that time Mr. Gros has not done that, has not

13   attempted to do that.

14       Months go by -- about three months go by and in

15   August of 2008 NCIS investigators show up to his house.  In

16   the meantime keep in mind that he hasn't heard anything at

17   all about this incident with respect to JSO.  He thinks

18   that's over.  So when the NCIS officers come to his house, he

19   thinks they're there to help him.  He thinks finally these

20   people are here to respond to my complaints.  He was home,

21   his roommate and friend, Vicki, was home as was her son.

22   They came in, they presented their badges and they said we're

23   here to find out about the planes.  They go inside and they

24   proceed to tell them I was doing an investigation, in fact, I

25   have videos.  They took them to the backyard, they pointed up

1    to the air above the pine trees where the planes were flying,

2    they let them know how often this was happening.  They showed

3    them the calendars, and they gave them all the DVD videos

4    they had been taking so they could prove, look, they're

5    flying too low.  Again he cooperated fully and he was honest

6    and straightforward with the answers he was giving to NCIS.

7           He even let them know he was fearful and anxious

8    when the planes were flying overhead because he was worried

9    they couldn't see his house.  His neighborhood is rather

10   dark, so at night when they were flying, he would turn on all

11   the lights around his house, including the floodlights, to

12   alert the planes to know that he was there with his family.

13   From his perspective he thought the Navy was going to take

14   his complaints seriously and take them on to whatever

15   authorities would be able to deal with those -- with those

16   complaints.

17          And instead what ended up happening is, of course,

18   he was charged, initially with 49 U.S.C., Section 46308,

19   interfering with a true light or signal, and subsequently

20   with 18 U.S.C., Section 32(a)5 and (a)(8) which he plead to.

21          I give you that background, Your Honor, not as an

22   excuse in any way but in a way for the Court to be able to

23   understand what was motivating Mr. Gros.  His motivation was

24   never intentional to obstruct, interfere or in any way get in

25   the way of what the pilots were doing.  His intent was always

1    to gather evidence to help defend his cause that there were

2    issues going on in his neighborhood.

3           One thing that you might ask, which I asked, why

4    only Mr. Gros, why not his neighbors.  There are other people

5    living around him, why were they not making those same

6    complaints?  Some of that has to do with who Mr. Gros is.

7           It happens that when he was a young adolescent he

8    suffered hearing loss, and as a result of that hearing loss

9    the kinds of noises that are bothersome to you and I are

10   bothersome even more to Mr. Gros.  It reverberates.  It's

11   louder.  It gives him a headache.  It's quite bothersome.  He

12   lives in a mobile home and not in a regular home, so,

13   therefore, there is not a lot of way for him to avoid getting

14   away from that noise.  After a long day from work he wants to

15   come home and relax, and this is how he kind of found

16   himself.

17          Beyond that hearing loss who he is as a person I

18   think is something that the Court needs to take into

19   consideration.  First, he has remained employed at Universal

20   Petroleum for a number of years.  He has the support of his

21   employer who is here in the courtroom with us, Mr. Jack

22   Burrow.  He called me in particular one day when he was

23   worried about Mr. Gros and allowed me to come in and talk to

24   Mr. Gros and speak to him on -- on his worksite premises.

25   He's an active member in his church and has been for more

1    than ten years and his minister is here.  If the judge would

2    like to hear from either one of them, they're happy to speak

3    to Your Honor.

4              In his past before all of this happened, when he

5    was born, I think his upbringing was also quite notable.  He

6    grew up in Louisiana, a large family, a family that did not

7    have very much means to support all of their children and

8    many of them were placed in foster homes.  But despite that

9    he graduated from high school, he entered the Air Force, was

10   honorably discharged from the Air Force.  And during one of

11   his assignments in Germany, as I'm sure Your Honor may have

12   read from the PSR, his young daughter fell from a third-story

13   window while she was in base housing, luckily she only broke

14   her leg, but that caused a lot of grief to him and a lot of

15   worry as I think it would for any parent.

16             Although that first marriage that he had ended in

17   divorce, he married again and his second wife died

18   unexpectedly.  That caused him also some grief.  And I think

19   maybe some in some ways having a friend like Vicki Jones come

20   into his life was helpful.

21             Ms. Jones is also present in court, Your Honor.

22   She is going through her own illness.  She also suffered the

23   loss of her spouse, and for that reason I think the two of

24   them being together is helpful and important to one another.

25   Symptoms of her illness can include being rather tired and

1    forgetful.  And she has told me that Henry helps her through

2    everything that she's going through.

3          Also I think that Mr. James Jones' letter is

4    especially telling.  He aptly explains how Henry has been

5    helpful to his family, almost like a second father to him, in

6    the short time that he's met him and how important he is to

7    this situation.  I think he can more readily explain the

8    frustration that Mr. Gros and Ms. Jones lived through by

9    living in the particular house that they live in.

10          As to the seriousness of the offense, Your Honor,

11    there's no question that my -- my client, Mr. Gros, is quite

12    anxious about today and has been quite anxious about all of

13    these proceedings.  He understands the seriousness of the

14    offense.  He has taken it seriously, and through his actions

15    he has demonstrated how seriously he has taken it.  When

16    asked by the JSO officer to stop what he was doing, he did.

17    He complied with the JSO officer and the NCIS investigators.

18          As shown also by the pretrial services report that

19    was submitted by the Court today, he's had no problems

20    whatsoever while he's been on pretrial release, including

21    maintaining his employment.  As a result, Your Honor, a

22    prison sentence in this case is not necessary.

23          One other thing for the Court to consider is that

24    it needs to avoid unwarranted sentencing disparities.  A part

25    of the filing that I gave to Your Honor yesterday included

1   the order and the criminal complaint in *United States v.*

2   *Bannick,* it's a New Jersey case, 2:05-cr-00200.  In that case

3   the defendant, David Bannick, used a laser -- not a

4   flashlight or a spotlight but a laser to target a passenger

5   Cessna plane that had six -- had the potential of having six

6   passengers in that plane, as well as a law enforcement

7   helicopter that was trying to find the location of the laser.

8   He pinpointed the laser at both the plane and at the

9   helicopter.  When the FBI found him and questioned him he

10  denied doing it and instead blamed it on his young daughter,

11  so he was also charged not only with the predecessor to what

12  Mr. Gros has been charged with today but he was also charged

13  with obstruction of justice.

14          He subsequently helped in the investigation, gave

15  his laser over to authorities, and on February 17, 2006, he

16  was allowed to plead to one count under Section 18.1993(a)(5)

17  and (b) and (2), Your Honor, and he received a term of two

18  years probation.  He did not receive a term of imprisonment.

19          I would submit to the Court that Mr. Gros' case is

20  quite less than what happened in Mr. Bannick's case.  Mr.

21  Gros was not intentionally trying to spotlight a particular

22  pilot or a particular plane for the purpose of impeding,

23  interfering or obstructing with that plane, he was simply

24  gathering information, probably not in the best way that he

25  could, but he was simply trying to gather information.

1          Additionally, he was not using a laser.  A laser

2     would be something that would blind a pilot, and in this case

3     that is not what happened.

4          And I would ask the Court to take all those things

5     into consideration when imposing sentence and I would ask the

6     Court to consider both probation and home detention for Mr.

7     Gros.  Thank you, Your Honor.

8          THE COURT:  What say the government?

9          MR. McKAY:  Your Honor, we have one witness in

10    aggravation we'd like to call.

11         THE COURT:  All right.

12         MR. McKAY:  I call Lieutenant Chris Ferreira.

13         THE CLERK:  Sir, please raise your right hand.

14         Do you solemnly swear that the evidence you're

15    about to give in the case now before this Court will be the

16    truth, the whole truth, and nothing but the truth, so help

17    you God?

18         THE WITNESS:  I do.

19         THE CLERK:  Thank you.  Please have a seat.

20         Sir, please state your full name and spell your

21    last name for the record.

22         THE WITNESS:  Lieutenant Christopher Edward

23    Ferreira, F-E-R-R-E-I-R-A.

24         THE CLERK:  Thank you.

25                    **CHRISTOPHER EDWARD FERREIRA,**

 1   called as a witness on behalf of the government, testified as

 2   follows:

 3                          DIRECT EXAMINATION

 4   BY MR. McKAY:

 5   **Q.**   Lieutenant Ferreira, can you explain to the Court what

 6   your current condition with the Navy is.

 7   **A.**   Yes.

 8            THE WITNESS:  Your Honor, I'm an instructor pilot

 9   with Carrier Airborne Early Warning Squadron 120 currently

10   training fleet replacement pilots in their graduate

11   education, fleet aircraft, for service to the fleet.

12   BY MR. McKAY:

13   **Q.**   So are those junior pilots?

14   **A.**   Yes, they are.

15   **Q.**   And what specifically are you training them on when

16   you're here in Jacksonville?

17   **A.**   We're training them on -- it's called field carrier

18   landing practice.  We're training them how to make day and

19   night approaches to the aircraft carrier for the carrier

20   qualification phase of flight training.

21   **Q.**   How many daytime sessions do you have and how many

22   nighttime training sessions do you have?

23   **A.**   Average eight a piece, eight days, eight nights.  It's

24   over a two-week time frame.  It begins on a Tuesday,

25   concludes on the following Thursday.

*FERREIRA - Direct*                                   20

1    **Q.**  And when you discussed --

2              THE COURT:  How long has this been done in

3    Jacksonville?

4              THE WITNESS:  We've been doing it -- sir, I don't

5    have an exact -- exact time frame, but in Jacksonville I'd

6    say for about five years.  I've been assigned to my unit for

7    just over two years and every detachment has been here in

8    Jacksonville.

9              THE COURT:  How often does that training take

10   place?

11             THE WITNESS:  About five times a year, sir.

12             THE COURT:  And you think it's been done in that

13   manner for about five years in Jacksonville?

14             THE WITNESS:  Yes, Your Honor.  Before Jacksonville

15   we had used Choctaw out in western Florida by Pensacola, but

16   the field is no longer serviceable for field carrier landing

17   practice.

18   BY MR. McKAY:

19   **Q.**  Is Whitehouse Field used by any other aircraft, or was

20   it at any other time?

21   **A.**  Yes, it had been used actually by the S-3 community.

22   They've since -- it's called a sundown.  They've done away

23   with their aircraft.  They're no longer based here at

24   Jacksonville.  And it is used by the T-45s in training the

25   pilots prior to coming to our squadron, so they do their day

*FERREIRA - Direct*

1   landing practice here prior to CQ here, carrier

2   qualification, here in -- off of Jacksonville.

3   **Q.**   When you're simulating your nighttime carrier landing,

4   what are you trying to create, what's the environment you're

5   trying to create?

6   **A.**   We're trying to create the darkest environment possible

7   to mimic the aircraft carrier at night.  What we do is --

8   general aviation practice is to dim all the cockpit lighting

9   such that the ambient lighting is always brighter, therefore,

10  more discernable than the cockpit lighting.

11          Also the runway environment is changed as well.  We

12  shut off all of the actual runway lights and turn on the

13  carrier box lights which are located on the -- on the left

14  closest portion of the runway.  The carrier box itself is lit

15  up by white lights and it's about 500 feet long.  And that's

16  where we make our approaches.

17  **Q.**   So it's essentially dark inside the cockpit and you

18  purposely make it dark just to be able to see that white box?

19  **A.**   Yes.  Again we're mimicking the night aircraft carrier

20  landing environment.

21  **Q.**   Were you here on May 4th doing that training?

22  **A.**   Yes.

23  **Q.**   Prior to coming had you been alerted that there were any

24  problems with this spotlighting issue?

25  **A.**   Yes, actually we are -- we're contracted to have a

1   course rules brief, and what it does is it kind of -- it

2   links NAS-Jax to Whitehouse, the outlying field.  And the

3   tower chief actually gives us the course rules to Whitehouse.

4   They alerted us that there have been many spotlighting

5   incidents on record and we should be aware of that.

6   **Q.**   Are there multiple flight patterns you use or just one

7   or two?

8   **A.**   There's one flight pattern we use, but it's to two

9   separate runways, Runway 2-9, which is the runway we were

10   flying our approaches to that evening, and then off-duty

11   runway which is the downward runway, Runway 1-1.

12   **Q.**   And where does the spotlight come from?

13   **A.**   The spotlighting comes from the southeast sector of

14   Runway 2-9, just about a mile and a half into the approach

15   end of Runway 2-9.

16   **Q.**   Is that the residential area?

17   **A.**   Yes.

18   **Q.**   What's on the other side?

19   **A.**   Nothing.  It's Southern White Pine logging.

20   **Q.**   Did you experience -- have you ever experienced

21   spotlighting before?

22   **A.**   Yes, a couple of times prior to this light.

23   **Q.**   And on this night did you experience spotlighting?

24   **A.**   Yes.

25   **Q.**   Can you describe to the judge exactly what you

1    experienced.

2    **A.**    Yes.

3          THE WITNESS:  Your Honor, actually on this night

4    particularly the spotlighting was just persistent.  In the

5    past we had -- we'd overflown the area at 600 feet to start

6    making our approach to the runway and occasionally you'd get

7    -- you'd get lit up.  This night it was perpetual.  Every

8    time we came through, myself and the other aircraft that were

9    in the pattern, we have generally up to five aircraft in the

10   landing pattern at any one point in time, we're just getting

11   spotlighted every single time.

12          The students, their night vision was, therefore,

13   impaired, the instructor's in the right seat, his vision was

14   impaired.  And we deemed it unsafe to train, wake up the

15   approaches and then delta the aircraft and set up the orbit

16   over the defendant's house to vector on the Sheriff's Office.

17   **Q.**    How many aircraft were affected?

18   **A.**    That night there were -- I believe there were three

19   aircraft airborne that night with two more en route.

20   **Q.**    Okay.  I'd like to -- you mentioned a flight pattern,

21   I'd like to talk to you about the height of the pattern.

22          When you're doing this during the daytime are you

23   following a different pattern than you are at night?

24   **A.**    No, it's the exact same pattern day or night.

25   **Q.**    Okay.  So if you're flying over the trees towards this

1   landing area through the residential area you're at the same

2   amount of height in the air, however many feet, every time

3   you make that approach?

4   **A.**   Yeah, we're projecting to get to this exact number, this

5   precise pattern.  But obviously there are some deviations in

6   the training pipeline, but never anything unsafe.  Generally

7   the pattern starts at 600 feet.  As we make our approach turn

8   we cross through 90 degrees of turn at 450 feet.  45 degrees

9   left in the turn we cross over about 425 to 375 feet, and

10  then we roll in our final approach phase to landing from

11  about 250 feet to touchdown.

12  **Q.**   Why do you know that that's the exact same every time,

13  or should be?

14  **A.**   That's what we shoot to.  It's based off of a training

15  manual set up, it's Carrier NATOP essentially.  It's the

16  Carrier Naval Aviation Training Operating Procedures &

17  Standardization Manual.

18              THE REPORTER:  I'm sorry.  Please repeat that.

19              THE WITNESS:  It's based off of our Carrier NATOP,

20  so Aircraft Carrier Naval Aviation Training Operating

21  Procedures & Standardization Manual.

22  BY MR. McKAY:

23  **Q.**   How long did the spotlighting occur in time duration

24  that night on May 4th?

25  **A.**   You mean each time the spotlight hit the aircraft?

1  **Q.**   From the time you started being spotlighted until the

2  time you cancelled.

3  **A.**   I would say we were out there 45 minutes, sir.

4  **Q.**   And the entire time --

5        THE COURT:  Is this a continuous spotlight for the

6  period of time you're actually in -- in this maneuver or

7  you're actually flying, or does it -- does it just go on and

8  on?

9        THE WITNESS:  It's a brief interval, Your Honor.

10  As we overfly that location where the aircraft is lit up, our

11  physiology and night vision is blinded and then we kind of

12  wave our approach off from there as we pass over the homes.

13        THE COURT:  How long -- how long would you

14  estimate, if you can?

15        THE WITNESS:  I would say it was probably, you

16  know, a one second duration, quick enough to take its sweep

17  over the aircraft but intense enough that any indication of

18  the instrumentation you had was lost.

19  BY MR. McKAY:

20  **Q.**   Did the spotlight illuminate the cockpit where you and

21  the other pilot were positioned?

22  **A.**   Yes.

23  **Q.**   To the point where it was unsafe to fly?

24  **A.**   Yes.

25        MR. McKAY:  I don't have any further questions.

1          THE COURT:  Cross examination?

2          MS. IRVIN:  Just briefly, Your Honor.

3                    CROSS EXAMINATION

4  BY MS. IRVIN:

5  **Q.**   Good morning, sir, how are you?

6  **A.**   Very well.

7  **Q.**   How many statements did you give to NCIS?

8  **A.**   Upon landing that night we were notified that -- that

9  the base was notified because, you know, we went through

10 Whitehouse tower and their tower chief and then obviously the

11 Sheriff's Office department, so when we landed we made a

12 statement to NCIS that day and then I believe that statement

13 was reviewed one other time.

14 **Q.**   So --

15         THE COURT:  When you say "reviewed," you mean

16 reviewed by whom?

17         THE WITNESS:  The local NCIS agent in Norfolk,

18 Virginia.

19         THE COURT:  They talked to you again, is that what

20 you're saying?

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  Okay.

23 BY MS. IRVIN:

24 **Q.**   Do you recall making a statement that was initially

25 dated June 2nd, 2008, and then it as was crossed out and

*FERREIRA - Cross*

27

1   there's a June 16 written underneath it?

2   **A.**   I made -- I made a statement around that time.

3          MS. IRVIN:  Your Honor, may I approach the witness

4   to show him the statement?

5          THE COURT:  Yes, ma'am.

6   BY MS. IRVIN:

7   **Q.**   Sir, do you recognize this statement?

8   **A.**   Yes, this is my statement.

9   **Q.**   Can you explain why the date is crossed out from the 2nd

10  to the 16th.

11  **A.**   I can't.

12  **Q.**   Were you the one that crossed it out?

13  **A.**   If my initials are next to it I would say yes.

14  **Q.**   Okay.  I didn't see your initials next to the date, I

15  apologize.

16          Can you also check the back page, do you recognize

17  this as being your signature?

18  **A.**   Yes.

19  **Q.**   Did you prepare this report?

20  **A.**   I did.

21  **Q.**   So you were the one that typed up the statement?

22  **A.**   Yes.

23  **Q.**   And, now, the night of May 4th when you landed -- you

24  normally do a debriefing; is that correct?

25  **A.**   Yes.

*FERREIRA - Cross*

28

1   **Q.**   And did you do a debriefing statement that night having

2   to do with this incident?

3   **A.**   I did.  That was a handwritten statement.  That

4   statement you have was -- was typed from the handwritten

5   statement.

6   **Q.**   And I'm not sure who you are based on the way the form

7   is, but were you Gray Hawk 4160 or 61?

8   **A.**   I can't recall which aircraft I was in, but I was in one

9   of those aircraft.

10   **Q.**   One of those aircraft.  And what was the name of the

11   student pilot that was in the plane with you?

12   **A.**   I couldn't tell you, we train so many students.

13   **Q.**   I just wanted to go over this to make sure that I

14   understood.  You gave a statement that day to NCIS, May 4th,

15   2008?

16   **A.**   I don't think it was that night, but it was during that

17   detachment when NCIS -- the local office approached us and

18   then upon return back to Norfolk.

19          THE COURT:  How long is the detachment?

20          THE WITNESS:  The detachments are two weeks, Your

21   Honor.

22   BY MS. IRVIN:

23   **Q.**   And at that time were you at the beginning or the end of

24   your detachment?

25   **A.**   Right in the middle.

1   **Q.**   Okay.  So at some point during that time that you were

2   here in Jacksonville you gave a statement to NCIS?

3   **A.**   Yes.

4   **Q.**   And that was your written statement?

5   **A.**   Yes.

6   **Q.**   And then you gave another statement which is the

7   statement that I showed you; is that correct?

8   **A.**   Yes.

9   **Q.**   And those are the only two statements that you gave?

10  **A.**   Yes.

11  **Q.**   One in March -- excuse me, one in May of 2008 and one in

12  June of 2008; is that correct?

13  **A.**   Yes.

14          MS. IRVIN:  Thank you.  No more questions, Your

15  Honor.

16          THE COURT:  All right.  Anything else?

17          MR. McKAY:  Nothing else.

18          THE COURT:  Thank you, Lieutenant.

19          THE WITNESS:  Thank you, Your Honor.

20          (Witness excused.)

21          THE COURT:  Any other witnesses?

22          MR. McKAY:  No, Your Honor.  If it please the

23  Court?  Your Honor, the facts of this case just simply don't

24  support what Mr. Gros is asserting here.  Quite simply --

25          THE COURT:  Which assertion is that?

1          MR. McKAY:  That he was spotlighting to gather

2     information.  Specifically, I'd like to point out paragraph

3     16 in the PSR is that when Mr. Gros was approached by NCIS,

4     he admitted that he had spotlighted the planes out of anger

5     and that he understood that this posed a safety hazard.

6     That's essentially what he had done.  He had made these

7     complaints to the Navy and to the senator with no relief.

8     And the reason he received no relief, which is essentially,

9     excuse me, the most aggravating factor is that Mr. Gros

10    signed a disclosure when he bought his property.  He was

11    wholly on notice that this was an active runway being used by

12    the Navy and Marine Corps.  He was told that you are going to

13    have a consequential -- significant consequences on the

14    property that he purchased.  He signed it in '05.  That's why

15    the Navy didn't respond any differently than continued to use

16    the airfield.  Their option would have been what, simply to

17    shut it down and not use it?

18          The Whitehouse airfield has been in use since 1940.

19    Mr. Gros purchased his property in 2005 on this notice.

20          Secondly, the pilot's report that this was not --

21    not necessarily going to be done during the day -- or at

22    nighttime, they were there during the day, they flew one

23    night mission and one day mission.  They flew the same exact

24    pattern.  If Mr. Gros needed to collect information or data

25    on them, he could have done it in the daylight without

1   putting any harm on the pilots, which he readily acknowledged

2   to NCIS exactly what he had done.

3            Furthermore, when JSO responds to the house they

4   don't find Mr. Gros with a camera and notepad, they simply

5   find him with a 15 million power watt spotlight that he had

6   been illuminating the aircraft with.  He was illuminating

7   each and every aircraft knowing that it was posing a danger.

8   This case simply does not warrant that much of a significant

9   downward departure from the guidelines.  Mr. Gros should be

10  sentenced within the guidelines.

11           18 U.S.C. 3553 guides this Court to look at the

12  seriousness of the offense.  The danger that he imposed on

13  these young, inexperienced pilots in training that were

14  specifically there to learn this new technique is

15  significant.  And, moreover, the side of the runway that they

16  were practicing on, which is within their rights, which is

17  exactly what the airfield is used for, is over a residential

18  area.  Fortunately there was no accident here.  But if he had

19  caused a plane to go down or something egregious, he's

20  putting his own neighborhood in danger.  The pilots and the

21  Navy equipment is not the only victim -- or potential victim

22  in this, it could have been much more serious.

23           His actions night blinded and disoriented the

24  pilots, and essentially they were willful.  He did this out

25  of anger.  The facts support that he got no relief and that

1   he took it upon himself to try to stop these pilots or

2   somehow punish the Navy for continuing to use the airfield.

3           For those reasons, Your Honor, there is no reason

4   to deviate from the sentencing guidelines and the government

5   would ask that Mr. Gros be sentenced to 18 months

6   incarceration followed by three years of supervised release.

7           THE COURT:  Counselor, you get the last word.

8           MS. IRVIN:  Thank you, Your Honor.  Your Honor, as

9   to the statement that he told NCIS officers that he

10  spotlighted the last plane in anger, he did do so in anger

11  and frustration but there's no indication from his statement

12  that he focused his spotlight on the cockpit of the planes,

13  only that he was frustrated.  They continued to fly over his

14  house, they continued to fly low and loud at night.

15          As to the disclosure statement which was submitted

16  in the government's notice of filing, the disclosure

17  statement is signed by Mr. Gros on January 24, 2005, and it

18  says simply this:  The undersigned hereby acknowledges the

19  disclosure of the fact that a Naval Air Marine Practice

20  Airfield is located within several miles of the subject

21  property, quote, Whitehouse Manner units one and two,

22  unquote, with consequential impact upon said property.  I

23  don't know what that means, and I don't think he knew what

24  that meant.

25          What he was trying to say was these planes are

1    flying over my house, I think they're too low, I think

2    they're too loud, will you investigate that for me and no one

3    did.  I don't think that his point was to say let's stop

4    these planes from flying here, let's close down this field.

5    His point was simply can someone investigate this and find

6    out if they are flying within whatever boundaries are set for

7    them.

8              He did not collect data during the day because he

9    worked but on the weekends he did.  And he particularly tried

10   to collect data at night because he found that that's when

11   they -- flew the lowest and -- and more loudly than they did

12   during the day.

13             THE COURT:  You know, the more I think about this,

14   the closer I come to the conclusion that any reasonable

15   person would know that doing what he's charged with doing

16   poses a risk of safety.

17             MS. IRVIN:  You're correct, Your Honor.

18             THE COURT:  The risk is significant.

19             MS. IRVIN:  The risk was significant enough that

20   the pilot made a statement to NCIS in May, during the time

21   that he was here on the detachment, and also in June.  And

22   for that reason early on in my investigation of this case I

23   asked the government's attorney where are the witness

24   statements, where's the evidence that these planes were in

25   trouble, and the government's attorney, not Mr. McKay but Mr.

1    Di Santis, gave me a number of filings as a part of

2    discovery.

3            THE COURT:  Well, I'm not suggesting that the

4    planes were in trouble.  My concern is the risk.

5            MS. IRVIN:  Yes, Your Honor.  And if I could just

6    finish that thought really quickly?  My point to Mr. Di

7    Santis is show me -- show me where it is, let my -- let my

8    client see what happens to these planes because all the

9    discovery we received up to that point was very general.  And

10   it wasn't until after the indictment had been superceded and

11   a week before trial that I actually received Lieutenant

12   Ferreira's and the other pilots' statements letting me know

13   to tell my client this is what happened.

14           All that to say, Your Honor, if we had received it

15   sooner, we would have been standing in front of you a few

16   months ago and not today.  But at that point through my

17   investigation up until November we didn't know what was going

18   on in those planes.

19           Mr. Di Santis attempted to get the call between the

20   tower so that I could have an idea of what was going on with

21   the pilots.

22           I don't disclaim the notion that there was some

23   risk involved, but from Mr. Gros' point of view his intent

24   was simply that night to gather evidence.  And his statements

25   remained the same all the way through from his speaking with

1    me, JSO, NCIS, nothing changed about that.  Was it the

2    smartest thing to do?  No.

3              THE COURT:  Let me ask this.  From the time of this

4    incident until the time of the indictment was there any other

5    training at Whitehouse?

6              MS. IRVIN:  There may have been some training, but

7    Mr. Gros has noted that since the beginning of this case

8    there have been less flights over his home in his

9    neighborhood, and those flights that have been over his home

10   and neighborhood have been further away and higher.  They

11   have not noticed as many flights during the duration of this

12   case, Your Honor.  And that may very well be coincidental.

13             THE COURT:  Does the government know, did the

14   training continue?

15             MR. McKAY:  Yes, Your Honor.  In fact, the

16   lieutenant who testified is scheduled to come back down next

17   month.

18             THE COURT:  I'm not talking about next month.  I'm

19   talking about from the time of this incident until the

20   indictment in this case.

21             MR. McKAY:  No, Your Honor, I have no knowledge

22   that the Navy's deviated from its training schedule at all.

23             THE COURT:  Go ahead, counsel.

24             MS. IRVIN:  One moment, Your Honor.

25             THE COURT:  Can you tell me why it took them so

1    long to investigate this?

2              MR. McKAY:  Your Honor, I believe they investigated

3    it over time.  Initially they couldn't identify where the

4    spotlight was coming from.  As the planes are flying over and

5    the spotlight's going on and off, it's difficult for them to

6    locate --

7              THE COURT:  Well, let me ask this -- let me ask

8    this.  As I understand it a JSO officer was called on the

9    date that this happened?

10             MR. McKAY:  Yes, Your Honor.

11             THE COURT:  And so everybody knew what had happened

12   at that point?

13             MR. McKAY:  Yes, Your Honor.  That specific night

14   the five planes stayed in the air.

15             THE COURT:  When did the Navy -- when did the Navy

16   get into its investigation?

17             MR. McKAY:  From -- from the JSO investigation NCIS

18   initiated their investigation.

19             THE COURT:  And as I understand it, they didn't --

20   it was over 90 days before they talked to the defendant?

21             MS. IRVIN:  August 19th, 2008, Your Honor.

22             MR. McKAY:  Which would have been -- no, not over

23   90 days, so 60 days roughly.  I can't speak to what NCIS was

24   doing in the interim.

25             THE COURT:  You know, the only reason I asked

1   that -- and I'm not sure it has a whole lot of relevance to

2   anything -- is that the Navy must not have thought it was a

3   problem --

4            MR. McKAY:  Well, the problem --

5            THE COURT:  -- or as serious a problem as I think

6   it is if they spent 60 days to even go to the man that did

7   it.

8            MR. McKAY:  Well, the -- the spotlighting had

9   stopped.  Once the JSO contacted him, the spotlight was

10  actually taken into evidence by the Sheriff's Office and the

11  problem had subsided.  And I can't -- I don't want to

12  misrepresent, I can't say that that was the reason why NCIS

13  took 60 days.  However, the nature of NCIS is also they're

14  much more diverse than over law enforcement agencies.  They

15  have an awful lot of physical protection assignments, they

16  travel a lot for force protection.  Criminal investigation is

17  not their only mission.

18           THE COURT:  Well, I'm not suggesting that it is.

19  I'm just suggesting if there is a risk that somebody is going

20  to shine a spotlight on one of these planes when it's in a

21  landing pattern, and it seems very dangerous, you jump into

22  it a little sooner to -- to put a stop to it, especially if

23  you know who did it.

24           MR. McKAY:  Well, I think it was stopped the moment

25  JSO encountered Mr. Gros with this spotlight and seized it.

1    And I believe defense even asserted that, that he hasn't done

2    this since, so the direct threat had been stopped that night

3    when the pilots took the effort to direct --

4         THE COURT:  But the Navy didn't know he was not

5    going to do it after that.  It so happens that, from what

6    counsel says, it didn't happen anymore, but what I'm saying

7    is the Navy didn't know that it was not going to happen.

8         MR. McKAY:  Immediately --

9         THE COURT:  And if you assume that somebody is out

10   there shining a light at a landing airplane because of the

11   noise that it creates in his neighborhood, and given a

12   history of some of these complaints and some of these

13   protests about this stuff, it looks to me like somebody would

14   -- would -- would really jump right into this thing and

15   resolve it.  But that's not -- that's not really a material

16   issue.

17        MR. McKAY:  Your Honor, I believe they did.  If I

18   could just briefly explain --

19        THE COURT:  And that's where she got that other

20   case, apparently it's happened before except that the

21   defendant that she's addressing used a laser.

22        MS. IRVIN:  Well, there are quite a few laser

23   cases, Your Honor, but no spotlight cases that I could find.

24        MR. McKAY:  Your Honor, if I may?  The Navy took

25   action.  The criminal investigative side is separate than the

1   operational Navy.  These pilots were briefed on it, they were

2   aware of it, they were told to be aware of it.  After this

3   happened they conducted a command investigation, that's where

4   most of the handwritten statements that defense counsel had

5   came from.  They came from a Navy investigation.  Then they

6   have to refer it to this civilian criminal investigation

7   agency just like they would have to refer something to the

8   FBI or whomever else.  The Navy themselves, the pilots

9   themselves and those commanders, did take action.  They did

10  the best they could.  They stayed there to identify where he

11  was coming from.  They called the local Sheriff's Office.

12  They had tried to call the local Sheriff's Office in the past

13  and couldn't direct exactly where he was.  This night Mr.

14  Gros had his light on almost constantly and they were able to

15  bring the Sheriff's Office to him.

16        THE COURT:  Go ahead, counsel.

17        MS. IRVIN:  Your Honor, the only thing I would

18  object to with respect to counsel's statements is that Mr.

19  Gros has taken responsibility for May 4th and that's all.  He

20  is not taking responsibility for whatever else has happened

21  in the past.  There have been other reports of fireworks and

22  other things being lit up in the air and so forth in this

23  neighborhood, not just on this his side but on the other side

24  of this airfield because of the frustration, or what have

25  you, that's been going on in this neighborhood.

1          With that said there are plenty of neighbors that

2     we spoke to who had reservations about talking to us because

3     they had already made statements to NCIS, didn't want to go

4     back on the general statements that they made, but were

5     concerned about what was going on in their neighborhood.  Not

6     as concerned as Mr. Gros was.  As I explained to you he is a

7     particular kind of defendant who is bothered by this noise

8     maybe more than his other -- his other neighbors.  But with

9     that in mind, Your Honor, I just wanted to also address your

10    question having to do with the investigation.

11         One of the reasons why I asked Lieutenant Ferreira

12    the question about when he gave his statements, he gave them

13    immediately in May and then he gave a finalized statement in

14    June and nothing happened, no investigation occurred until

15    August, and then my client, you know, arrested and indicted

16    in September, so it did take quite a bit of time for the

17    investigation to occur when they already knew who he was,

18    they already knew where he lived.  That was my question, what

19    took so long.

20         And additionally, when NCIS showed up to his house,

21    he was not clear that they were showing up to his house

22    solely because of that incident and to conduct a criminal

23    investigation.  He took it to mean they're helping me in this

24    cause that I've been trying to take to people's attention and

25    to help me.

1          Lastly, Your Honor, he's been honest and forthright

2     with his answers to JSO, NCIS; he's accepted his

3     responsibility -- his responsibility from -- for his actions

4     from the beginning.  I think that he would have accepted

5     responsibility sooner had some things been different about

6     the course of discovery in this case, and I think he would

7     have -- reading what the pilots said I think influenced his

8     decision to plead and to not go to trial.

9          His decision to use the light that night was not

10    well thought out, there's no question about that.  But I

11    think what the Court needs to look at is what was his intent.

12    His intent was not like of some of these other laser cases

13    where they are trying to play around with the pilot, they're

14    trying to mess around with their ability to fly their plane,

15    and that was not his intent in this case at all.  And I think

16    the time line that leads us up to that night indicates that

17    he was just collecting evidence as he told JSO and NCIS.

18    Thank you, Your Honor.

19          THE COURT:  Mr. Gros, is there anything you want to

20    say before I impose a sentence?

21          THE DEFENDANT:  Your Honor --

22          THE COURT:  If so come on up to the podium.

23          THE DEFENDANT:  I do apologize for the poor choice

24    of the instrument I used for the purpose of trying to gather

25    evidence.  He was talking about the flights, they flew

1    another set of flights at the end of July and beginning of

2    August which I recorded that with an outside camera and that

3    didn't interfere with anything.  I presented those videos to

4    NCIS when they came over because I was under the impression

5    we were finally going to get somebody to look into what's

6    going on here and give me an answer and I haven't heard

7    anything.  They took the videos and that's the last I heard

8    of them.  But my intentions were never to do any harm to

9    anybody.  My intentions were just please explain to me why

10   you're flying so low over the top of my house when your

11   approved flight path is several hundred feet north of me.

12   And that's all I was trying to do, Your Honor.

13        THE COURT:  All right.  I'm -- like I said, I

14   really think what the defendant did in this case posed a

15   substantial risk to -- to the pilots and probably some risk

16   to the neighborhood that Mr. Gros lives in insofar as these

17   pilots being able to control these airplanes, especially on a

18   maneuver that sounds -- sounds difficult to most of us.  It

19   may not be difficult to them, but it sounds pretty difficult

20   to start off with.  Practicing landing a speeding jet on a

21   ship in the water, the thought of it is even scary.  But I

22   would -- I would imagine that as difficult as that type of

23   conduct is, he made it dangerous because of the flashing of

24   this light.

25        I think I also have to give -- give the defendant

1    some credit because I don't think he intended to injure

2    anybody.  And I think that he has lot of support, but -- a

3    lot of community and family support, and he's done a lot of

4    good with his life, especially having looked at his past

5    criminal record that seems to have come to a stop -- a

6    conscientious stop at some point and he did nothing else

7    which in and of itself is admirable.  It's been a long time

8    since he's been in any type of trouble, so I've got to give

9    him some -- some credit for that.  But I do think an

10   incarcerated sentence is appropriate in this case.

11           All right.  Having asked the defendant why judgment

12   should not now be pronounced, no cause to the contrary

13   appearing to the Court, it's the judgment of the Court that

14   the defendant, Henry J. Gros, is hereby committed to the

15   custody of the Bureau of Prisons to be incarcerated for a

16   term of one year one day.

17           Upon release from imprisonment he's to be placed on

18   supervised release for a term of three years.  The standard

19   terms and conditions shall apply.

20           A special condition will be that he is to cooperate

21   in the collection of DNA as directed by the probation office.

22           I am -- the mandatory drug testing requirements of

23   the Violent Crime Control Act are suspended, he poses a low

24   risk of substance abuse.

25           The Court waives the imposition of the cost of

1    supervision and imprisonment based on his financial status.

2            He is required to pay to the United States a

3    special assessment of $100 which is due immediately.

4            For the reasons stated I think that the sentence

5    imposed complies with 3553 and find that the sentence is

6    sufficient, the sentence is reasonable and not greater than

7    necessary to comply with the statutory purposes of

8    sentencing.

9            Under the plea agreement I believe the government

10   agrees to dismiss Count One of the superseding indictment.

11           MR. McKAY:  That's correct, Your Honor.

12           THE COURT:  And the original indictment.

13           MR. McKAY:  Yes, Your Honor.

14           THE COURT:  Based on that motion both are

15   dismissed.  I am going to permit him to voluntarily surrender

16   at an institution designated by the Bureau of Prisons.  He's

17   ordered to report to the designated institution no later than

18   June 4th at -- no later than 2:00 p.m. on June 4th.

19           Mr. Gros, in your plea agreement, paragraph B(5),

20   you waived and gave up your right to appeal this sentence

21   either directly or collaterally unless one of four things

22   happened; first being a sentence in excess of the applicable

23   guidelines; a sentence above the statutory maximum; a

24   sentence in violation of the law separate and apart from the

25   guidelines; or if the government exercises its right to

1   appeal the sentence which it does have.

2         To the extent that you have a right to appeal you

3   must do it within ten days.  Failure to appeal within the

4   ten-day period means you waive your right to do so.  As I've

5   indicated the government may appeal the sentence also.

6         If you wanted to appeal and couldn't afford counsel

7   one would be provided to represent you.

8         Having pronounced sentence does counsel for the

9   defendant or the government have any objections to the

10   sentence or the manner in which the Court pronounced sentence

11   other than what's been stated?

12         MR. McKAY:  None from the government.

13         MS. IRVIN:  None from the defense, Your Honor.  If

14   it's possible for there to be a Court recommendation that he

15   be kept to a facility somewhere close to Jacksonville, for

16   example, Coleman, I'd appreciate it, Your Honor.

17         THE COURT:  I will recommend Coleman.

18         MS. IRVIN:  Thank you, Your Honor.

19         THE COURT:  All right.  Good luck to you, sir.

20         (The hearing was concluded.)

21

22

23

24

25

1                         CERTIFICATE

2    UNITED STATES DISTRICT COURT

3    MIDDLE DISTRICT OF FLORIDA

4              I hereby certify that the foregoing transcript is a

5    true and correct computer-aided transcription of my stenotype

6    notes taken at the time and place indicated therein.

7

8                   ------------------------------------------
                    DEANNE M. MOORE
9                   Official Court Reporter
                    United States District Court
10                  Middle District of Florida.

11

12

13

14

15

16

17

18

19   *Registered Merit Reporter (RMR)*

20   *Certified Realtime Reporter (CRR)*

21

22

23

24

25